# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA
# WESTERN DIVISION
## Civil Action No. 5:19-cv-25-FL

| | |
|---|---|
| **Robert McGuire**<br><br>        **Plaintiff,**<br><br>v.<br><br>**Lord Corporation**<br><br>        **Defendant.** | **Proposed Amended Complaint**<br>**(Jury Demand)** |

NOW COMES Plaintiff, Robert McGuire, and amends his Complaint, alleging and complaining of the Defendant as follows:

## Parties

1. Plaintiff, Robert McGuire ("Mr. McGuire") is a United States citizen and resident of Minneapolis, Hennepin County, Minnesota.

2. Defendant Lord Corporation ("Defendant," "Lord," or the "Company"), is a Pennsylvania corporation registered to do business in North Carolina and with its principal office located in Cary, Wake County, North Carolina.

## Jurisdiction and Venue

3. The Superior Court has jurisdiction over this matter pursuant to N.C. Gen. Stat. § 7A - 243 as the amount in controversy exceeds twenty-five thousand dollars ($25,000).

4. Venue is proper in Wake County pursuant to N.C. Gen. Stat. § 1-77 as the Defendant's principal office is located in Cary, Wake County, North Carolina.

1

## Procedural Requirements

5. Mr. McGuire filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on May 10, 2018.

6. On September 9, 2018, Mr. McGuire received the EEOC's Notice of Right to Sue (See attached Exhibit "A") and commenced this action within ninety (90) days of its receipt.

7. Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure and with leave of Court, Mr. McGuire now files this Amended Complaint.

## NATURE OF THE ACTION

8. This is a proceeding to recover damages caused by Defendant's retaliatory termination of Mr. McGuire in violation of Title VII of the Civil Rights Act of 1964.

9. Mr. McGuire seeks equitable relief, monetary relief, compensatory damages, attorney's fees and costs, and punitive damages pursuant to 42 U.S.C.§ 2000(e), *et seq*.

## FACTUAL BACKGROUND

10. Defendant hired Mr. McGuire on or around October 4, 2013 for the position of Regional Director, Japan.

11. As Regional Director, Japan, Mr. McGuire directed the Company's strategy in Japan, including the development of strategic objectives to support enterprise growth.

12. Under Mr. McGuire's leadership, Defendant Lord's profits in Japan more than doubled and sales increased more than 25%.

13. During his time at Lord Corporation, Mr. McGuire received multiple performance-related recognitions and accolades, including being awarded the second highest "spot bonus" in the Company and receiving a personal note of appreciation from Lord's CEO in 2017.

14. Because of Mr. McGuire's success, others in the organization began to resent him.

15. In September or October of 2016, Mr. McGuire began to hear rumors that a colleague, Zhong Bei ("Ms. Bei") did not like him and was spreading false information about him in an attempt to have him removed from the organization.

16. Specifically, Mr. McGuire heard through sources at the Company that Ms. Bei filed a complaint against him for sexual harassment in an attempt to get him fired.

17. In fact, Mr. McGuire was the one who felt harassed by Ms. Bei's offensive conduct.

18. Ms. Bei knew Mr. McGuire was married and did not enjoy bawdy humor, so she went out of her way to make sexually suggestive comments whenever she spoke with him and she seemed to enjoy making him uncomfortable by trying to touch and flirt with him at Company events.

19. Mr. McGuire found Ms. Bei's behavior so disturbing that he was forced to begin planning ahead for company events, taking special care to avoid Ms. Bei and even asking his Japanese colleagues to keep an eye out for Ms. Bei and to keep her away from him.

20. Not only did Ms. Bei's unwelcome and sexually explicit conduct offend Mr. McGuire, but it made attending company events incredibly stressful for Mr. McGuire, as he had reason to believe Ms. Bei was attempting to entrap him in a compromising situation and then claim he sexually harassed her.

21. Because of Ms. Bei's previous sexual harassment claim against Mr. McGuire, he was nervous to report her inappropriate behavior to Human Resources, as he was afraid he would not be taken seriously or they would think he was retaliating against her.

22. In 2017, Mr. McGuire became aware of a "special pricing" plan created by Ms. Bei wherein Lord offered steeply discounted products to a distributor through collaboration with former Lord China employee, Randy Ruan, as part of an agreement with Mr. Ruan and the

distributor that the distributor would not distribute any products made by Dow Chemicals, a competitor of Lord's.

23. To Mr. McGuire, paying off distributors by granting them special pricing in order to stifle competition was not only bad business practice, but possibly even a violation of Chinese and/or American competition law and a threat to the Company's reputation and long-term interests in the region.

24. When Mr. McGuire raised this concern to Gareth McAllister ("Mr. McAllister"), LORD president of Asia Pacific, and other company executives at a meeting of Asia regional leadership in Hong Kong, Mr. McGuire was ignored.

25. Not long after the meeting in Hong Kong, several colleagues warned Mr. McGuire that Ms. Bei and Mr. McAllister were very good friends, such that trying to address concerns about Ms. Bei's behavior with Mr. McAllister was a bad idea.

26. In April 2017 at a work event held at the Homewood Suites in Cary, North Carolina, Ms. Bei caught Mr. McGuire unawares and, before he could escape, she began touching and hanging on him.

27. Mr. McGuire immediately demanded that Ms. Bei stop and he pulled himself away from her and hurried out of the room. Lord Japan's Marketing Manager, Mr. Shunichiro Imai, witnessed the entire incident.

28. Because of Mr. McGuire's considerable rapport with Japanese business partners, Mr. McAllister directed Mr. McGuire to assist Ms. Bei in connecting with Japanese customers in China.

29. As part of this effort, Mr. McGuire planned to assist Ms. Bei in leading an important meeting with a Japanese client scheduled for July of 2017.

4

30. When Ms. Bei failed to appear for the meeting, Mr. McGuire presented to the client successfully by himself.

31. A few months later, in early September of 2017, Mr. McGuire traveled to Nagoya, Japan to attend an inter region meeting of LORD employees.

32. Although Mr. McGuire took pains to avoid Ms. Bei, she managed to corner him when he was briefly separated from his colleagues, and she immediately launched into her typical aggressive and sexually lewd flirtations.

33. Mr. McGuire greeted Ms. Bei politely and formally, trying to change the tone of her conversation, and he asked her why she missed their recent meeting with the important Japanese client.

34. Ms. Bei protested loudly that it was not her fault she missed the meeting, she was on her period that day and it was really bad.

35. To Mr. McGuire's mortification, Ms. Bei continued to describe her menstruation in graphic detail, including sharing that everyone could always tell she was on her period because she only wore pants on her period.

36. Ms. Bei indicated the pants she was wearing, then, to Mr. McGuire's shock, Ms. Bei pulled down the elastic waistband of her pants, along with her underwear, to reveal her private parts and show him the blood from her period.

37. Horrified and embarrassed, Mr. McGuire hurried away from the situation as soon as he could.

38. Only a few days later, on September 15, 2017, Mr. McGuire met with Lord's Manager of Human Resources in Japan, Mr. Takeshi Masumitsu, regarding Ms. Bei's offensive and inappropriate conduct.

39. Mr. McGuire chose to discuss the matter discreetly with Mr. Masumitsu because he felt more comfortable discussing the details of the humiliating situation with another man, rather than the female HR Director in Hong Kong.

40. As the HR Manager for Japan, it was Mr. Masumitsu's duty to report this sexual harassment incident up the chain of command.

41. Less than two months later, on November 13, 2017, Mr. McAllister met with McGuire and informed him Lord was terminating his employment.

42. During this meeting, Mr. McAllister presented Mr. McGuire with an "Agreement for Separation" (the "Separation Agreement") (Document No. 17-1) and directed him to sign it.

43. Still reeling from the news of his termination and concerned about the impact on himself and his family, Mr. McGuire asked for more time to review the Separation Agreement.

44. During the next few days, Mr. McGuire attempted to negotiate the terms of the Separation Agreement, but Mr. McAllister flatly refused, threatening not only to terminate Mr. McGuire's employment without any severance whatsoever, but to withhold compensation Mr. McGuire had already earned (Mr. McGuire's $150,000 annual performance bonus), if Mr. McGuire did not sign the Separation Agreement as written.

45. Among other concerns about the Separation Agreement, Mr. McGuire suspected that the Company could not legally threaten to withhold income already earned, but McAllister's tight timeline did not permit him the opportunity to consult with an attorney licensed in Japan.

46. On or about November 17, 2019, after hearing Mr. McGuire's detailed account of the sexual harassment, retaliation, and potential corporate corruption he witnessed at Lord, the Company's Director of Global Compliance, Wren Mitchell ("Ms. Mitchell"), advised Mr. McGuire not to sign the Separation Agreement until the Company could conduct a thorough

investigation.

47. Mr. McGuire trusted Ms. Mitchell's commitment to investigating the wrongdoing, but Mr. McAllister's threats continued, and Mr. McGuire feared that refusing to sign the Separation Agreement would result in serious financial loss.

48. During phone calls and in text messages on November 17 and 18, Mr. McGuire informed Ms. Mitchell of the pressure he was under to sign the Separation Agreement, and his concerns that, by signing the Separation Agreement, he would be allowing the individuals responsible for the sexual harassment, retaliation, and other wrongdoing to escape liability and to continue harming the Company.

49. Although she claimed that Lord's formal investigation into the misconduct could not begin until after the Thanksgiving holiday, Ms. Mitchell assured Mr. McGuire that "the investigation is completely separate from your departure negotiations," thus his signing the Separation Agreement would not prevent the company from investigating.

50. Mr. McGuire told Ms. Mitchell that he did not want to sign the Separation Agreement until the company investigated the wrongdoing, but Mr. McAllister's ultimatum left him with no choice.

51. Based on Ms. Mitchell's assurance that she would investigate the wrongdoing, Mr. McGuire reluctantly agreed to sign the Separation Agreement, but told Ms. Mitchell he was signing under duress, and that he was not waiving his rights to bring a claim for unlawful harassment and retaliation based on the subject matter of the investigation.

52. On November 19, 2017, after signing the Separation Agreement, Mr. McGuire followed up with Ms. Mitchell, providing her with more information for her investigation into the wrongdoing at Lord.

53. When months passed without any further investigation by Defendant into the harassment and retaliation Mr. McGuire experienced, he realized Defendant had never actually intended to investigate once it obtained his signature on the Separation Agreement.

54. Lord ostensibly terminated Mr. McGuire for failing to succeed in his role, however that claim lacks credibility given the fact that the company's profits and sales in Japan skyrocketed under Mr. McGuire's leadership, and given the personal commendation Mr. McGuire received from Lord's CEO not long before Mr. McGuire's termination.

55. On information and belief, Lord terminated Mr. McGuire in retaliation for opposing Ms. Bei's offensive workplace conduct and for making a claim to HR, or in the alternative, Mr. McGuire's sexual harassment claim against Ms. Bei was a substantial factor in Defendant's decision to terminate Mr. McGuire's employment.

56. Additionally, Mr. McGuire was over 40 years of age at the time of his termination, was meeting Defendant's legitimate performance expectations, and on information and belief was replaced by someone substantially younger.

57. Because of his termination, Mr. McGuire suffered financial harm, in an amount to be determined by a jury at trial in this matter.

## CLAIM FOR RELIEF:
### Discrimination/ Retaliatory Discharge in Violation of Title VII

58. Mr. McGuire incorporates by reference the preceding paragraphs as if fully set forth herein.

59. Mr. McGuire engaged in protected activity, namely reporting Ms. Bei's sexual harassment to Human Resources.

60. In violation of Mr. McGuire's rights under Title VII, Defendant terminated Mr. McGuire in retaliation for asserting his right to be free from sexual harassment in the workplace.

61. As a direct and proximate result of Defendant's conduct, in this respect, Mr. McGuire has suffered and will suffer damages, *inter alia*, lost wages and future pecuniary losses, as well as emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses in an amount to be determined at trial but believed to be in excess of twenty-five thousand dollars ($25,000.00).

62. Mr. McGuire is entitled to all his benefits of employment, including but not limited to, back pay, front pay, health insurance, life insurance, retirement benefits, and the value of certain stock options had Mr. McGuire retained his position.

### **Punitive Damages**

63. Mr. McGuire incorporates by reference the preceding paragraphs as if fully set forth herein.

64. In terminating Mr. McGuire because he engaged in protected activity, Defendant acted intentionally and/or with malice or with reckless indifference to Mr. McGuire's federally-protected rights.

65. Because Defendant based its decision to terminate Mr. McGuire on factors so unlawful that a statutory violation was obvious, and because Defendant repeatedly failed to remedy the violations of Mr. McGuire's rights inflicted by Ms. Bei's harassment and extremely offensive conduct, Defendant's misconduct gives rise to an award of punitive damages in the maximum amount allowable by law.

### **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff, Robert McGuire, prays the Court for the following relief:

1. For Mr. McGuire, compensatory damages, *inter alia*, lost wages, lost benefits, mental distress, loss of enjoyment of life, damage to reputation, financial harm, and other injury

in excess of twenty-five thousand dollars ($25,000.00);

2. For punitive damages against Defendant pursuant to § 1981A(a)(1) of the Civil Rights Act of 1991, for Defendant's intentional discrimination against Mr. McGuire in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as allowed by law and in such amount as may be determined in the discretion of the jury.

3. That the Court permanently enjoin Defendant from violating the provisions of Title VII;

4. That Mr. McGuire recover from the Defendant reasonable costs and expenses, including attorney's fees, in bringing this action;

5. For pre-judgment and post-judgment interest on all amounts found due to Mr. McGuire at the legal rate;

6. For a trial by jury on all issues so triable; and

7. For such further and additional relief at law and equity as the Court may deem just and proper.

**THIS THE 21ST DAY OF OCTOBER, 2019.**

**VENNUM PLLC**

By: */s/ Elizabeth Vennum*
Elizabeth Vennum
N.C. State Bar No. 49747
Vennum PLLC
8510 McAlpine Park Drive
Suite 210
Charlotte, NC 28270
liz@vennumlaw.com
Tel. (980) 338-0111
*Counsel for Plaintiff*