IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:19-CV-25-FL

ROBERT MCGUIRE,                    )
                                   )
                 Plaintiff,        )
                                   )
        v.                         )                    ORDER
                                   )
LORD CORPORATION,                  )
                                   )
                 Defendant.        )

This matter is before the court upon defendant's motion to dismiss plaintiff's amended

complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE

34). Plaintiff has responded in opposition and defendant replied. In this posture, the issues raised

are ripe for ruling. For the following reasons, the motion is granted.

## STATEMENT OF THE CASE

Plaintiff initiated this action in Wake County Superior Court, on December 27, 2018,

asserting claims of discrimination and retaliatory discharge against defendant, his alleged former

employer, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

("Title VII"). Plaintiff claims that he was terminated from employment with defendant in

retaliation for asserting his right to be free from sexual harassment in the workplace from a co-

worker. Plaintiff seeks compensatory damages, including lost wages, as well as punitive damages,

injunctive relief, attorney's fees, and interest.

Defendant removed to this court on January 24, 2019, and filed a motion to dismiss the

original complaint on March 14, 2019, relying upon an Agreement for Separation between plaintiff

and Lord Japan, Inc. (hereinafter, the "Separation Agreement"). On September 30, 2019, this court granted defendant's motion to dismiss, ordering plaintiff's claims dismissed without prejudice, and allowing plaintiff to file a motion for leave to amend his complaint. Over defendant's opposition, the court allowed plaintiff to file the operative first amended complaint in a text order entered on January 9, 2020.

Plaintiff asserts in the amended complaint the same claims and seeks the same relief that he sought in his original complaint. Plaintiff has added factual allegations regarding the Separation Agreement and the circumstances surrounding his execution of the Separation Agreement.

Defendant filed the instant motion to dismiss for failure to state a claim on January 24, 2020. In opposition, plaintiff relies upon a memorandum from Yasuyoshi Goto ("Goto") to plaintiff's counsel, regarding "Japanese Law on Duress." (DE 36-1 at 1). Plaintiff also relies upon a declaration by Goto. (DE 37). In reply, defendant relies upon a declaration of Rikisuke Yamanaka ("Yamanaka") and a memorandum summarizing Japanese law. (DE 32).

### STATEMENT OF ALLEGED FACTS

The facts alleged in the amended complaint as pertinent to the instant motion, may be summarized as follows.

Plaintiff is a resident of Minnesota, and defendant is a Pennsylvania corporation with principal office in North Carolina. Defendant hired plaintiff on October 4, 2013, for the position of "Regional Director, Japan." (Am. Compl. ¶ 10). "As Regional Director, Japan, [plaintiff] directed [defendant's] strategy in Japan, including the development of strategic objectives to support enterprise growth." (Id. ¶ 11). "Under [plaintiff's] leadership, [defendant's] profits in Japan more than doubled and sales increased more than 25%." (Id. ¶ 12). During his time of employment plaintiff "received multiple performance-related recognitions and accolades,

including being awarded the second highest 'spot bonus' in the company and receiving a personal note of appreciation from [defendant's] CEO in 2017." (Id. ¶ 13).

According to the complaint, in 2016, plaintiff heard "rumors that a colleague, Zhong Bei ('Ms. Bei') did not like him and was spreading false information," including a "complaint against him for sexual harassment in an attempt to get him fired." (Id. ¶¶ 15-16). In fact, according to the complaint, plaintiff was subject to sexual harassment from Ms. Bei, who made "sexually suggestive comments whenever she spoke with [plaintiff]," tried to "touch and flirt with him at company events," giving plaintiff reason to believe she "was attempting to entrap him in a compromising situation and then claim he sexually harassed her." (Id. ¶¶ 18, 20).

Plaintiff raised concerns about a "special pricing" plan created by Bei to Gareth McAllister ("McAllister"), defendant's "president of Asia Pacific," and other company executives at a meeting of Asia regional leadership. (Id. ¶¶ 23-24). Plaintiff "was ignored" and "several colleagues warned [plaintiff] that [Bei] and [McAllister] were very good friends, such that trying to address concerns about [Bei's] behavior with [McAllister] was a bad idea." (Id. ¶ 25).

After Bei again "began touching him and hanging on to him" at a work event in April 2017, plaintiff demanded that she stop. (Id. ¶¶ 26-27). "Because of [plaintiff's] considerable rapport with Japanese business partners, [McAllister] directed [plaintiff] to assist [Bei] in connecting with Japanese customers in China." (Id. ¶ 28). According to the complaint, in early September, at a regional employee meeting, when plaintiff was briefly separated from his colleagues, Bei "immediately launched into her typical aggressive and sexually lewd flirtations." (Id. ¶ 32). During the course of plaintiff's conversation with Bei, she "describe[d] her menstruation in graphic detail," and she exposed herself to plaintiff. (Id. ¶¶ 35-36).

On September 15, 2017, plaintiff met with defendant's manager of human resources in Japan, to discuss the details "of the humiliating situation" "regarding Ms. Bei's offensive and inappropriate conduct." (Id. ¶ 38-39). It was this manager's duty "to report this sexual harassment incident up the chain of command." (Id. ¶ 40).

"Less than two months later, on November 13, 2017, [McAllister] met with [plaintiff] and informed [plaintiff that defendant] was terminating his employment." (Id. ¶ 41). During this meeting McAllister presented plaintiff with the Separation Agreement and directed him to sign it. Plaintiff alleges the following circumstances surrounding his consideration of the Separation Agreement:

> Still reeling from the news of his termination and concerned about the impact on himself and his family, [plaintiff] asked for more time to review the Separation Agreement.
>
> During the next few days, [plaintiff] attempted to negotiate the terms of the Separation Agreement, but [McAllister] flatly refused, threatening not only to terminate [plaintiff's] employment without any severance whatsoever, but to withhold compensation [plaintiff] had already earned ([plaintiff's] $150,000 annual performance bonus), if [plaintiff] did not sign the Separation Agreement as written.
>
> Among other concerns about the Separation Agreement, [plaintiff] suspected that the Company could not legally threaten to withhold income already earned, but McAllister's tight timeline did not permit him the opportunity to consult with an attorney licensed in Japan.
>
> On or about November 17, 2019, after hearing [plaintiff's] detailed account of the sexual harassment, retaliation, and potential corporate corruption he witnessed at Lord, the Company's Director of Global Compliance, Wren Mitchell ["Mitchell"], advised [plaintiff] not to sign the Separation Agreement until the Company could conduct a thorough investigation.
>
> [Plaintiff] trusted [Mitchell's] commitment to investigating the wrongdoing, but [McAllister's] threats continued, and [plaintiff] feared that refusing to sign the Separation Agreement would result in serious financial loss.
>
> During phone calls and in text messages on November 17 and 18, [plaintiff] informed [Mitchell] of the pressure he was under to sign the Separation Agreement, and his concerns that, by signing the Separation Agreement, he would be allowing

the individuals responsible for the sexual harassment, retaliation, and other wrongdoing to escape liability and to continue harming the Company.

Although she claimed that Lord's formal investigation into the misconduct could not begin until after the Thanksgiving holiday, [Mitchell] assured [plaintiff] that "the investigation is completely separate from your departure negotiations," thus his signing the Separation Agreement would not prevent the company from investigating.

[Plaintiff] told [Mitchell] that he did not want to sign the Separation Agreement until the company investigated the wrongdoing, but [McAllister's] ultimatum left him with no choice.

Based on [Mitchell's] assurance that she would investigate the wrongdoing, [plaintiff] reluctantly agreed to sign the Separation Agreement, but told Ms. Mitchell he was signing under duress, and that he was not waiving his rights to bring a claim for unlawful harassment and retaliation based on the subject matter of the investigation.

On November 19, 2017, after signing the Separation Agreement, [plaintiff] followed up with [Mitchell], providing her with more information for her investigation into the wrongdoing at Lord.

(Id. ¶¶ 43-52).

Plaintiff alleges that "months passed without any further investigation by Defendant into the harassment and retaliation [plaintiff] experienced." (Id. ¶ 53). According to the complaint, although defendant "ostensibly terminated [plaintiff] for failing to succeed in his role," defendant in fact terminated plaintiff "in retaliation for opposing [Bei's] offensive workplace conduct and for making a claim to HR, or in the alternative, [plaintiff's] sexual harassment claim against [Bei] was a substantial factor in [defendant's] decision to terminate [plaintiff's] employment." (Id. ¶¶ 54-55). Plaintiff also asserts in the complaint that he "was over 40 years of age at the time of his termination, was meeting [defendant's] legitimate performance expectations, and . . . was replaced by someone substantially younger." (Id. ¶ 56). "Because of his termination, [plaintiff] suffered financial harm." (Id. ¶ 57).

## COURT'S DISCUSSION

A.    Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B.    Analysis

Defendant argues that plaintiff's claims under Title VII must be dismissed due to a release of all claims in the Separation Agreement, which provides, in pertinent part:

Article 5. FULL AND FINAL SETTLEMENT

The Employee recognizes that the payments set out in Article 6 below exceed legal or contractual minimum requirements and therefore irrevocably and unconditionally releases and forever discharges the Company and its affiliates, including without limitation their directors, officers, executives, partners, stakeholders, agents, attorneys, insurers and employees, past and present, and each of them, from any and all claims in full and final settlement of any rights or obligations that may exist on the date hereof or at any time hereafter in connection with or arising out of the Employment Agreement and/or the termination thereof.

(Separation Agreement (DE 17-1) at 4; see Am. Compl. ¶ 42 (expressly referencing Separation Agreement filed at DE 17-1)). The Separation Agreement further provides:

6

## Article 6. COMPENSATION

In consideration for the Employee's acceptance of the undertakings and obligations as stated in this Agreement for Separation and in full and final settlement of all of the Employee's rights and/or claims in connection the employment of Employee as well as the termination of employment with the Company set out in Articles 1 through 5, the Company agrees to pay the Employee the following sums, the timing and amount of which is set out below.

(Id. at 4-5).[1]   The Separation Agreement then lists five categories of severance pay, benefits, and incentives, and other terms, due to plaintiff.  (Id. at 5).

"[A]n employee may waive his cause of action under Title VII as part of a voluntary settlement." Alexander v. Gardner-Denver Co., 415 U.S. 36, 52 (1974).  "In determining the effectiveness of any such waiver, a court [must] determine at the outset that the employee's consent to the settlement was voluntary and knowing." Id. at 52, n. 15.  "Settlement agreements operate on contract principles, and thus the preclusive effect of a settlement agreement should be measured by the intent of the parties." Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 211 (4th Cir. 2009) (quotations omitted).

Settlement releases are analyzed "under ordinary contract principles," based upon "the appropriate state's law for guidance," in the absence of statutorily-mandated requirements for waiver of some types of federal claims, such as those under the Age Discrimination in Employment Act ("ADEA"), 29. U.S.C. § 626(f)(1). O'Shea v. Commercial Credit Corp., 930 F.2d 358, 362 (4th Cir. 1991); cf. Oubre v. Entergy Operations, Inc., 522 U.S. 422, 426–27 (1998) (analyzing requirements for waiver of ADEA claim under federal statutory standards set forth in § 626(f)(1)).

---

[1]  Page numbers in citations to documents with a docket entry (DE) reference are to the page number specified in the court's case management /electronic case filing (CM/ECF) system, and not to the page number, if any, showing on the face of the underlying document.

Regarding the principles for evaluating a release, the United States Court of Appeals for the Fourth Circuit has observed:

> Some federal courts have misleadingly referred to 'the federal common law of release.' . . . . In O'Shea, we chose not to adopt the federal common law rule used by some circuits for determining the validity of such a release, but rather to rely upon relevant state law principles. The precise ruling in O'Shea has of course been superseded by the limitations on waivers of ADEA rights that Congress created in the Older Workers Benefit Protection Act. See 29 U.S.C.A. § 626(f) (1999). Be that as it may, we note that courts can resolve interstitial questions of federal law either by formulating a federal common law rule or by adopting existing state law. . . .

Kendall v. City of Chesapeake, Va., 174 F.3d 437, 441 n. 1 (4th Cir. 1999); cf. Fulgence v. J. Ray McDermott & Co., 662 F.2d 1207, 1209 (5th Cir. 1981) ("Creation of a federal rule rather than absorption of a state rule is appropriate where, as here, the rights of the litigants and the operative legal policies derive from a federal source. No significant state interest would be served by absorbing state law as the rule of decision governing Title VII settlement agreements."); Melanson v. Browning-Ferris Indus., Inc., 281 F.3d 272, 276 (1st Cir. 2002) ("In determining the validity of a [Title VII] release, this court has adopted a 'totality of the circumstances' approach."); Cassiday v. Greenhorne & O'Mara, Inc., 63 F. App'x 169 (4th Cir. 2003) (affirming district court determination "based on the totality of the circumstances, that [the plaintiff] knowingly and voluntarily waived her rights under Title VII").[2]

Under North Carolina law, "[a] release is the giving up or abandoning of a claim or right to the person against whom the claim exists or the right is to be exercised," and a "waiver is a voluntary and intentional relinquishment of a known right or benefit." Adder v. Holman & Moody, Inc., 288 N.C. 484, 492 (1975). "Whether [an] agreement be called a release, a waiver or be given

---

[2] Defendant urges the court to apply a federal common law "totality of the circumstances test" to determine validity of the release. (Def's Mem. (DE 35) at 7). As set forth above, the court does not resolve definitively the test to be applied, where the Fourth Circuit also has not done so in a published opinion, and where the outcome is the same under state law, federal law, or, as discussed further herein, Japanese law.

some other designation . . . [it] is a contract and is therefore subject to the recognized rules of construction of contracts."  Id.

"Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Phillip Morris USA Inc., 363 N.C. 623, 631 (2009) (internal citation and quotation omitted). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." Carolina Power & Light Co. v. Bowman, 229 N.C. 682, 693-94 (1949). "Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631 (1976); see also Goodman v. Resolution Tr. Corp., 7 F.3d 1123, 1126 (4th Cir. 1993) ("If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law.").

In this case, the Separation Agreement includes a plain and unambiguous release of "any and all claims in full and final settlement of any rights or obligations that may exist on the date hereof." (DE 17-1 at 4).  It memorializes in plain terms defendant's agreement to pay plaintiff "in full and final settlement of all of the Employee's rights and/or claims in connection [sic] the employment of Employee as well as the termination of employment" amounts set forth in the Separation Agreement. (Id.). The release is not qualified in any way; it "irrevocably and unconditionally releases and forever discharges the Company and its affiliates," which include defendant, from claims by plaintiff.  (Id.).

The Separation Agreement is a knowing and voluntary release of all claims, based upon its terms and upon consideration of the totality of circumstances alleged. For example, one critical

factor bearing upon this determination is that plaintiff allegedly is a sophisticated, highly-compensated, and successful businessman. Plaintiff alleges that he has substantial corporate executive expertise, where defendant hired plaintiff on October 4, 2013, for the position of "Regional Director, Japan." (Am. Compl. ¶ 10). "As Regional Director, Japan, [plaintiff] directed [defendant's] strategy in Japan, including the development of strategic objectives to support enterprise growth." (Id. ¶ 11). "Under [plaintiff's] leadership, [defendant's] profits in Japan more than doubled and sales increased more than 25%." (Id. ¶ 12). During his time of employment plaintiff "received multiple performance-related recognitions and accolades, including being awarded the second highest 'spot bonus' in the company and receiving a personal note of appreciation from [defendant's] CEO in 2017." (Id. ¶ 13). In addition, plaintiff "was over 40 years of age at the time of his termination," and he allegedly "was meeting [defendant's] legitimate performance expectations." (Id. ¶ 56).

It is also critical to finding a knowing and voluntary waiver under the circumstances alleged that the Separation Agreement is clearly written to recite its purposes and mutual benefits to both plaintiff and defendant. It states in its preamble that "the Company and the Employee have decided to enter into this Agreement for Separation in order to set forth the terms and conditions of the termination of the EMPLOYEE AGREEMENT by mutual consent," where the term "EMPLOYEE AGREEMENT" is defined as plaintiff's employment agreement with the Company that commenced October 4, 2013. (DE 17-1 at 2). The agreement describes confidential information trade secrets, non-competition agreements, and other terms for transition of "all of [plaintiff's] work to be taken over by a person designated by the Company." (Id. at 2-3).

It is also important to a waiver determination that the Separation Agreement, by its terms and by the circumstances alleged, was subject of plaintiff's consideration over a period of time

and with advice of others. For example, the Separation Agreement expressly allows plaintiff to disclose the contents of the Separation Agreement to his "spouse, tax advisor, and/or an attorney with whom [plaintiff] chooses to consult <u>regarding [plaintiff's] consideration of this Agreement for Separation</u>." (<u>Id.</u> at 4) (emphasis added). Plaintiff allegedly reviewed and negotiated the terms of the Separation Agreement over six days. (Am. Compl. ¶¶ 41, 44, 52). During this time, he engaged in detailed discussions with defendant's director of global compliance, in addition to multiple communications with McAllister. (<u>Id.</u> ¶¶ 41-52). Furthermore, plaintiff initialed each page of the Separation Agreement and signed it. (DE 17-1 at 2-7).

Finally, the Separation Agreement provides for payment of a substantial sum to be paid to plaintiff in consideration for his release of all claims. It states that defendant "shall pay" plaintiff "a severance payment equivalent to JPY 11,766,947 as set forth in the calculation on Schedule 1 . . . which shall be issued within seven (7) days after the Termination Date," specified to be February 13, 2018. (<u>Id.</u> at 4, 7). In turn, "SCHEDULE 1" provides a schedule of "SEPARATION BENEFITS," providing for a "Severance Payment" of JPY 11,766,947, and it provides a "Relocation Subsidy" of JPY 1,000,000, for a Total Separation Benefits Amount of "JPY 12,766,947 [USD 112,968]." (<u>Id.</u> at 7). It further recites that "[t]he above payment has included all required notice and statutory severance that you are eligible and entitled to in respect of the termination of your employment and no other separation payment shall be made other than as stated" in Article 6 of the Separation Agreement. (<u>Id.</u> at 7).

In sum, based upon the totality of the circumstances alleged, plaintiff "waive[d] his cause of action under Title VII as part of a voluntary settlement," and such "consent to the settlement was voluntary and knowing." <u>Alexander</u>, 415 U.S. at 52. Accordingly, the instant claims by plaintiff against defendant are barred and must be dismissed as a matter of law.

11

Plaintiff argues he is not bound by the waiver in the Separation Agreement because he executed it under duress, mistake, and fraud by defendant, as those concepts are understood in Japanese law. In support of application of Japanese law, plaintiff invokes a section of the Separation Agreement captioned "GOVERNING LAW AND JURISDICTION," which states that the Separation Agreement "shall be interpreted under the laws of Japan and any disputes arising from or in connection with this Agreement shall be exclusively brought to the Tokyo District Court." (DE 17-1 at 6).

As an initial matter, plaintiff has not demonstrated that Japanese law should apply instead of North Carolina law, or federal common law, in interpreting the validity of the waiver in the Separation Agreement, as it applies to the Title VII claims that plaintiff brought in the first place in North Carolina state court. Where plaintiff is pursuing this Title VII action in North Carolina, and where plaintiff has disavowed validity of the Separation Agreement in its entirety, it is incongruous for plaintiff now to claim continued validity of a limited portion of the Separation Agreement in the form of the governing law and jurisdiction clause. Moreover, the United States Supreme Court has imposed standards under federal law for waiver by an employee of a "cause of action under Title VII as part of a voluntary settlement," by directing this "court [to] determine at the outset that the employee's consent to the settlement was voluntary and knowing." Alexander, 415 U.S. at 52 & n. 15. In sum, if plaintiff seeks to have the Separation Agreement deemed invalid in this court for purposes of plaintiff's instant Title VII claims, this court must look to the controlling law of this forum to do so.

In any event, plaintiff has not demonstrated that Japanese law is materially different from North Carolina law, or federal common law, with respect to the application of issues of duress, mistake, or fraud, to the allegations of the complaint. "[I]n absence of proof to the contrary, the

presumption is that the law of [the foreign country] with regard to the right of recovery is the same as the Law of this country, the lex fori." <u>Heredia v. Davies</u>, 12 F.2d 500, 501 (4th Cir. 1926); <u>see</u> <u>Baker v. Booz Allen Hamilton, Inc.</u>, 358 F. App'x 476, 481 (4th Cir. 2009) (stating "the district court should apply the forum state's law" unless the party claiming foreign law applies carries the burden of "proving foreign law to enable the district court to apply it"). As set forth below, plaintiff has failed to allege facts permitting an inference of duress, mistake, or fraud, sufficient to invalidate the Separation Agreement, under either North Carolina law, federal common law, or Japanese law.[3]

1.    Duress

"Duress exists where one by the unlawful act of another is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will." <u>Adder v. Holman & Moody, Inc.</u>, 288 N.C. 484, 490 (1975). "Duress is commonly said to be of the person where it is manifested by imprisonment, or by threats, or by an exhibition of force which apparently cannot be resisted." <u>Id.</u> "Or it may be of the goods, when one is obliged to submit to an illegal exaction in order to obtain possession of his goods and chattels from one who has [w]rongfully taken them into possession." <u>Id.</u>

As pertinent here, the Supreme Court of North Carolina has noted the following "essential characteristics of economic duress": 1) "[a] threatened violation of a contractual duty ordinarily is not in itself coercive, but if failure to receive the promised performance will result in irreparable

---

[3]    In so holding, the court does not reach defendant's additional arguments that plaintiff ratified the Separation Agreement and defendant is not plaintiff's employer. The court also does not reach defendant's argument that plaintiff's memorandum and declaration was untimely. In addition, to the extent the court's January 9, 2020, text order summarily granting plaintiff's motion for leave to amend can be interpreted to constitute a prior determination on whether plaintiff's amended complaint states a claim upon which relief can be granted, the court disavows any such suggestion. At the time of plaintiff's motion for leave to amend, plaintiff had not submitted any proof of Japanese law to support his claims of duress, mistake, or fraud, and the court in its discretion allowed the motion to amend under the Rule 15 standard. The instant briefing on the application of Japanese law has demonstrated that the amended complaint fails to state a claim upon which relief can be granted in light of the release in the Separation Agreement.

injury to business, the threat may involve duress"; 2) "a threat to breach a contract, if it does create severe economic pressure upon the other party, can constitute duress where the threat is effective because of economic power not derived from the contract itself"; 3) "a mere threat by one party to breach the contract by not delivering the required items, though wrongful, does not in itself constitute economic duress. It must also appear that the threatened party could not obtain the goods from another source of supply"; 4) "In addition, it must appear that there was no immediate and adequate remedy in the courts which would enable the buyer to resist the sellers demand." Rose v. Vulcan Materials Co., 282 N.C. 643, 665 (1973). In sum, key requirements of economic duress are "irreparable injury," "economic power not derived from the contract itself," and "no immediate and adequate remedy in the courts." Id. [4]

Plaintiff's allegations in the amended complaint do not meet this standard for duress. Plaintiff asserts that he was under duress because "McAllister threatened to withhold [plaintiff's] performance bonus if he did not sign the agreement." (Pl's Opp. (DE 36) at 14; see, e.g., Am. Compl. ¶ 44 (stating that McAllister threatened "to withhold compensation [plaintiff] had already earned ([plaintiff's] $150,000 annual performance bonus"); Pl's Opp. (DE 36) at 16 n. 5 ("His employment contract with LORD guaranteed him three month's termination notice and thus obliged LORD to employ him through mid February."). In this manner, plaintiff suggests that a threat by defendant to breach plaintiff's employment contract terms constituted duress to sign the Separation Agreement. But, such a threat to breach a contract can only constitute duress if it will

---

[4] Federal common law is consistent with these essential elements of duress. In determining federal common law, the Fourth Circuit will "seek the appropriate federal rule in the usual sources—the best-reasoned decisions in the general common law development of the subject," including as expressed in the "Restatement (Second) of Contracts." Gamewell Mfg., Inc. v. HVAC Supply, Inc., 715 F.2d 112, 117 (4th Cir. 1983). For example, the Restatement (Second) of Contracts provides for invalidating assent when "physically compelled," § 174, when "induced by an improper threat by the other party that leaves the victim no reasonable alternative" § 175(1), and procured through "undue influence by the other party" § 177.

result in "irreparable injury," if it is effective due to "economic power not derived from the contract itself," and if there "no immediate and adequate remedy in the courts." <u>Vulcan Materials Co.</u>, 282 N.C. at 665. The alleged threat to breach plaintiff's employment contract terms does not satisfy any of these requirements: it is not irreparable injury, because plaintiff could have recourse in the courts for breach of employment contract, as plaintiff himself allegedly suspected at the time. (<u>See</u> Am. Compl. ¶ 45).

In addition, the alleged threat is not effective due to "economic power not derived from the contract itself," <u>Vulcan</u>, 282 N.C. at 665, where plaintiff is alleged to be a sophisticated and successful businessman, not in a position of domination by another. <u>See, e.g.,</u> Restatement (Second) Contracts § 177(b) ("The rule stated in this Section protects a person only if he is under the domination of another or is justified, by virtue of his relation with another in assuming that the other will not act inconsistently with his welfare. Relations that often fall within the rule include those of parent and child, husband and wife, clergyman and parishioner, and physician and patient.").

Furthermore, the alleged threat to withhold bonus compensation does not constitute duress in light of the totality of the circumstances, as set forth previously, regarding the terms of the Separation Agreement and its execution. In particular, where plaintiff had already been informed that he was being terminated, and where the Separation Agreement provided plaintiff with favorable consideration and terms for wind up of employment in exchange for his release of claims, defendant's alleged "threat[]" to withhold an allegedly earned performance bonus, (Am. Compl. ¶ 44), does not constitute duress as a matter of law.

Plaintiff's argument that Japanese law requires a different result is unavailing. With respect to duress, plaintiff cites to Article 96 of the Civil Code of Japan, which provides that

"[m]anifestation of intention which is induced by any fraud or duress may be rescinded." (Pl's Opp. (DE 36) at 14; Goto Mem. (DE 36-1) at 4). Citation to this civil code merely begs the question what constitutes actionable duress under Japanese law. In addition, the cases cited in the Goto memorandum are inapposite under the circumstances alleged, and do not aid plaintiff's case.

In particular, plaintiff cites to the "*Ishimi Kotsu* case (Matsue District Court, Masuda Branch, November 18, 1969)" which is described as a case where a general manager of a tour bus company told an employee that her behavior in having an affair with a tour bus driver "constituted a reason for disciplinary dismissal under the company's work rules and asked her to submit a resignation notice, rather than being terminated." (DE 36-1 at 5). The employee had worked for the company for only five months, and she was summoned to a room where the "general manager began criticizing and abusing her, with a very loud voice, for her having an affair with the bus driver." (Id.). "With so much of astonishment, the tour conductor could not defend herself, and she signed the resignation notice." (Id.). "The court held that her having an affair with the bus driver and her becoming pregnant are about her personal [sic] having nothing to do with the operation of the company, that the company did not have a justifiable reason to terminate her, that the company's obtaining her resignation notice based on this groundless claim is unlawful, and that this constitutes duress." (Id. at 6).

The *Ishimi Kotsu* case, as described in the Goto memorandum, is inapposite in multiple respects. First, it did not involve a contract for release of claims, as here, accompanied by substantial severance compensation to the executing employee. Rather, the validity of the resignation itself, and the justification for the termination, was at issue. (Id.). Second, the case involves circumstances where the employee ostensibly was terminated for a "personal" matter, (id.), as opposed to here where defendant "ostensibly terminated [plaintiff] for failing to succeed

16

in his role." (Am. Compl. ¶ 54). Third, the case involved additional circumstances of an 18 year old inexperienced employee being confronted by a manager, deputy manager, and human resources employee, in a single room, being criticized and abused verbally, and being presented in that instance with a form resignation notice, which the employee signed without delay. (DE 36-1 at 5). None of these additional circumstances of duress are present here.

In sum, plaintiff has not alleged facts giving rise to a plausible claim of duress under state law, federal common law, or Japanese law.

2.    Mistake

"[I]n appropriate circumstances a unilateral mistake of fact may be the basis for rescinding a settlement agreement." Gamewell Mfg., Inc. v. HVAC Supply, Inc., 715 F.2d 112, 114 (4th Cir. 1983). In particular, "[w]here a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him . . . [and] enforcement of the contract would be unconscionable," then the contract may be rescinded. Id. (quoting Restatement (Second) of Contracts § 153(a)). "[A]voidance for unilateral mistake is generally allowed if two conditions concur: (1) enforcement of the contract against the mistaken party would be oppressive, or, at least, result in an unconscionably unequal change of values and (2) rescission would impose no substantial hardship on the other." Id. (quotations omitted). "Relief has been afforded for unilateral mistake where the notice (of mistake) was reasonably prompt and the offeree has not altered its position so that relief would work a hardship upon it." Id. at 117 (quotations omitted).

Likewise, under North Carolina law, a contract may be avoided under some circumstances for a "unilateral mistake." Creech v. Melnik, 347 N.C. 520, 528 (1998). "[H]owever, in order to affect the binding force of a contract, the mistake must be of an existing or past fact which is

material; it must be as to a fact which enters into and forms the basis of the contract, or in other words it must be of the essence of the agreement, the sine qua non, or, as is sometimes said, the efficient cause of the agreement, and must be such that it animates and controls the conduct of the parties." MacKay v. McIntosh, 270 N.C. 69, 73 (1967).

Here, plaintiff fails to allege a mistake sufficient to allow for rescission of the Separation Agreement. Plaintiff asserts that he signed the Separation Agreement under the mistaken belief that defendant could withhold his performance bonus if he did not sign the Separation Agreement. However, as an initial matter, this is not an allegation a "mistake of fact" or "an existing or past fact." Gamewell, 715 F.2d at 114; MacKay, 270 N.C. at 73. Instead, it is a representation about a legal right under hypothetical future conditions.

In addition, the asserted mistake is not alleged to have a "material effect on the agreed exchange of performances that is adverse to" plaintiff, and it is not "a fact which enters into and forms the basis of the contract, or . . . the essence of the agreement, the sine qua non." Gamewell, 715 F.2d at 114; MacKay, 270 N.C. at 73. Indeed, defendant's ability to withhold performance bonus if plaintiff did not sign is not even mentioned in the text of the Separation Agreement, much less mentioned as the animating and controlling fact leading to the agreement. Nor is it the only factor that plaintiff alleges was included in his oral discussions surrounding the execution of the agreement and his consideration thereof, including its "impact on himself and his family," "fear of financial loss," whether "he would be allowing the individuals responsible for the sexual harassment, retaliation, and other wrongdoing to escape liability and to continue harming the Company," and assurance regarding investigation into the wrongdoing. (Am. Compl. ¶¶ 43, 47, 48, 51).

Furthermore, plaintiff has not alleged that enforcement of the Separation Agreement "would be oppressive, or, at least, result in an unconscionably unequal change of values" or that rescission would impose no substantial hardship" on defendant. Nor has he alleged "reasonably prompt" notice of the mistake, or that defendant "has not altered its position so that relief would work a hardship upon it." Gamewell, 715 F.2d at 117. To the contrary, the Separation Agreement provided plaintiff substantial economic benefits, its rescission at this juncture would impose substantial hardship on defendant by reopening claims settled by the agreement, and plaintiff has not alleged that he provided prompt notice of any mistake to defendant before defendant performed its obligations under the Separation Agreement.

Plaintiff fails to demonstrate that Japanese law requires a different result as to his assertion of a unilateral mistake. The Goto memorandum begins with a citation to Article 95 of the Civil Code of Japan, which provides that "[m]anifestation of intention has no effect when there is a mistake in any element of the juristic act in question." (DE 36-1 at 3). The two cases cited to illustrate this standard, however, are inapposite. Neither address the enforceability of a release of claims. (See id. at 3-4). Rather, they involve the validity of a resignation notice, where an employer informed an employee that they would be subject to disciplinary dismissal or termination if the resignation notice was not signed. (See id.). For example, in "*Gakko Hojin Tkushin Gakuen (Yokohama High School)* case (Yokohama District Court, November 8, 1995)," a teacher at a school submitted a resignation notice because he failed to attend a school event, upon being told that if he did not do so he would be subject to disciplinary dismissal. (Id.). The court held that because the employee's conduct was not actually a basis for disciplinary dismissal, the resignation notice was submitted by mistake. (Id.).

19

These cases stand in contrast to the instant case, where plaintiff was already informed of his termination at the time he executed the release, the validity of the reason for the termination was not the subject of the mistake, and the alleged mistake was not the sole reason for executing the release. Much more pertinent to the instant case is the "*Singer Sewing Machine*" case, cited by defendant in the Yamanaka memorandum, where the court upheld validity of a letter of intent signed upon resignation, which waived his right to claim retirement allowances. (DE 32-1 at 2). The court rejected the employee's claim that he made a mistake because he believed he had reserved his intention to waive retirement allowances, based upon factors such as the employee's educational background, the language of the letter of intent, and his discussions with the company about the letter of intent. (DE 32-1 at 2-3). These factors similarly preclude a finding of mistake here. Moreover, it is a critical to Japanese law, like American law, that the alleged mistake must be "the principal reason" for the agreement, (DE 32-1 at 3), which element here is lacking.

In sum, plaintiff has not alleged facts giving rise to a plausible claim of mistake under state law, federal common law, or Japanese law.

3. Fraud

To state a claim for fraud, a plaintiff must allege "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Forbis v. Neal, 361 N.C. 519, 526-27 (2007) (quotations omitted). "Additionally, any reliance on the allegedly false representations must be reasonable." Id. at 527. "As a general rule, a mere promissory representation will not be sufficient to support an action for fraud." Johnson v. Phoenix Mut. Life Ins. Co., 300 N.C. 247, 255 (1980). "A promissory misrepresentation may constitute actionable fraud when it is made with intent to deceive the promisee, and the promisor, at the time of making

it, has no intent to comply." Id. "A mere recommendation or statement of opinion ordinarily cannot be the basis of a cause of action for fraud." Id.

Plaintiff does not allege facts giving rise to a plausible inference of fraud. Plaintiff asserts that defendant, through its agent, Mitchell, misrepresented to plaintiff that defendant "would investigate [plaintiff's] sexual harassment allegations if he signed the Separation Agreement although the company ultimately had no intention of conducting such investigation." (Pl's Mem. (DE 36) at 16). According to the complaint, "[b]ased on [Mitchell's] assurance that she would investigate the wrongdoing, [plaintiff] reluctantly agreed to sign the Separation Agreement." (Am. Compl. ¶ 51). These allegations are unavailing in multiple respects. First, the alleged misrepresentations are not statements about a "material fact," Forbis, 361 N.C. at 526, but rather statements about defendant "would" do in the event plaintiff signed the Separation Agreement. (Am. Compl. ¶ 51). Plaintiff has not alleged a misrepresentation of existing past or present fact, but rather a promissory representation.

Second, plaintiff has not alleged facts permitting an inference that defendant did not intend to comply with its promise to "investigate[] the wrongdoing." (Am. Compl. ¶¶ 50 – 51). Facts alleged, such as Mitchell's alleged claim "that Lord's formal investigation into the misconduct could not begin until after the Thanksgiving holiday, and assurance that "the investigation is completely separate from your departure negotiations," (id. ¶ 49), run contrary to such an inference. Plaintiff's assertion that he later "realized Defendant had never actually intended to investigate once it obtained his signature on the Separation Agreement" is a conclusory assertion devoid of factual support. (Id. ¶ 53).

Third, and relatedly, the alleged promise to "investigate[] the wrongdoing" (id.), also is insufficiently specific to support a claim of fraud, where plaintiff has not alleged with specificity

the "contents of the false representations." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999). An assured "investigation into the misconduct" is ambiguous, has no definite terms, characteristics, or conditions, and thus is not an actionable fraudulent misrepresentation.

Fourth, plaintiff has failed to plead facts permitting an inference that he reasonably relied upon Mitchell's statements about a company investigation before signing the Separation Agreement. Where plaintiff alleges that Mitchell assured him that "the investigation is completely separate from your departure negotiations," (Am. Compl. ¶ 49), there is no basis in the representations to conclude that plaintiff reasonably relied on the representations in signing the Separation Agreement. Moreover, the plain terms of the Separation Agreement, which do not mention a company investigation, counter any inference that the Separation Agreement was tied to the company's investigation of wrongdoing.

Plaintiff's references to Japanese law do not sustain plaintiff's claim of fraud. Article 93 of the Civil Code of Japan provides: "The validity of the manifestation of intention shall not be impaired even if the person who makes the manifestation knows that it does not reflect his/her true intention; provided however, that, in cases the other party knew, or could have know, the true intention of the person who makes the manifestation, such manifestation of intention shall be void." (Goto Mem. (DE 36-1) at 1-2). The case plaintiff cites to illustrate this concept is inapposite. In "***Showa Women's University*** case (Tokyo District Court, February 2, 1992)," the court held that a resignation notice submitted by an employee to a university was void because the employee did not truly intend to resign, not because the employer had made a misrepresentation to the employee. (Id. at 2-3).

By contrast, Japanese authorities cited by defendant are more pertinent, where they confirm the defects in plaintiff's claim of fraud, consistent with the outcome of the court's analysis under North Carolina law and federal common law. In particular, under Japanese law, the alleged misrepresentation must be the animating cause of the contract that plaintiff seeks to rescind. (See Yamanaka Decl. (DE 32-1) at 4). As discussed previously, plaintiff has not alleged that he reasonably relied upon the alleged misrepresentation in signing the Separation Agreement, and the plain terms of the agreement belie any such inference. Moreover, under Japanese law, mere concealment of a party's true intention does not constitute actionable fraud "if the deceitful act is not deemed to be illegal under socially accepted standards." (Id.). Plaintiff does not allege any facts permitting an inference that the alleged misrepresentation was illegal.

In sum, plaintiff has not alleged facts giving rise to a plausible claim of fraud under state law, federal common law, or Japanese law. Accordingly, plaintiff has not alleged any basis for avoiding the terms of the Separation Agreement. Where the court has determined based on the totality of the circumstances alleged that plaintiff voluntarily and knowingly entered into the Separation Agreement releasing the instant Title VII claims, plaintiff's action must be dismissed as a matter of law for failure to state a claim upon which relief can be granted. In addition, where plaintiff previously was given an opportunity to amend the complaint, and it is likely further amendment of the complaint will be futile, the court dismisses plaintiff's action with prejudice.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 34) is GRANTED. Plaintiff's action is DISMISSED WITH PREJUDICE. The clerk is DIRECTED to close this case.

SO ORDERED, this the 27th day of April, 2020.

LOUISE W. FLANAGAN
United States District Judge